Good morning, Your Honors. My name is Karen Bucher, and I represent Christopher Iruke, and with the Court's permission, I'd like to reserve five minutes for rebuttal. This is the case of the search inside of a church, and I think the first question is, where was Miss Morroquin arrested? Because if she was arrested outside of the church, then the searches authorized in Maryland v. Bowie are not applicable, and the subsequent search of the church was unlawful, and all the evidence should be suppressed. And if you look at Agent Braun's testimony, it shows that she was actually arrested outside. He came to the door, he knocked on it, the door opened, a female answered the door, he asked, Are you Miss Morroquin? And she says, No, Miss Morroquin is next to me. He stepped halfway into the door, didn't touch them, but ordered them to come out. The first female came out first, then Miss Morroquin came out second, and once they were both out, that's when Miss Morroquin was arrested. Okay, so what do we do about the District Court's finding that Miss Morroquin was arrested in Boyer A? Is that clearly erroneous? Yes, that is my argument, Your Honor, because when you look at Agent Braun's testimony, he is the one that actually was there, who knocked on the door, who testified as to what happened during those events. And based on his testimony, she was clearly arrested outside. And that's our first position, and if that is accepted, then there's no need to go further. Well, I have the same concern, counsel. I'm looking at page two of Judge King's factual findings, the paragraph at the bottom of the page. It begins, the agents approached the Arms of Grace to execute the arrest warrant. After knocking twice on the door of Arms of Grace, a woman answered. We find as a matter of fact that the door was answered by a person who was not Morroquin. In resolving this contested issue of fact, we choose to believe the testimony of Special Agents Kuntz and Braun, because we find their testimony to be most credible. And then he goes on to talk about the fact, I guess, that it wasn't Morroquin who answered the door, and that the arrest occurred on the premises. My point is, if you look at Agent Braun's testimony, which the district court did, the finding was clearly erroneous, based on what he said happened. He was there. Yeah, but the fact finder is the one who basically declares what the fact is. So I guess, I think I understand your argument to be we should look at the agent's testimony ourselves and conclude that it simply does not support that factual finding. Yes, Your Honor, that was clear. No reasonable trier of fact could have reached that conclusion after listening to the testimony of the agent. Yes, Your Honor, that's my position, yes. Okay. So if that is what this Court finds, then I think the case is over. But if that's not the case, and this Court finds that Miss Morroquin was arrested inside the church, then Maryland v. Brewery comes in. And at that point, the agent's, the area to be searched is that area, that room A, that foyer. That is all that should have been searched. Everybody was out at this point. Well, he found room, I'm going over now, take a look at the top of page 3. In its findings of fact, the district court goes on to say that we find, as a matter of fact, that the agents observed Morroquin near the entrance to the door inside the entry foyer, room A, and the agents stepped into arms of grace to effect the arrest. We find that Morroquin was under arrest at the time she was removed from the arms of grace and that room A constitutes the place of arrest. Yes, Your Honor, and that's where I'm at now. Assuming that's where she was arrested, then the agents, the scope of the search, should have been limited to that first room, that foyer, room A. But doesn't Supreme Court and Ninth Circuit authority say agents can conduct a protective sweep of the rooms adjoining the place of arrest? The key word is immediately adjoining. Well, we have a diagram, do we not, which I assume was introduced into evidence at the hearing on the motion to suppress. Yes, Your Honor, it's at ER 168. Okay. And that looks to me like to be a pretty big open church space. Yes, Your Honor. They went into room A, and then went into room B, and what happened, they went deeper and deeper and deeper into the church, into the ballroom, and also to an upstairs loft. Well, before we get to the loft, let me just look at Exhibit 3, which is ER 168. And as I understood the testimony, that was the agent's diagram of the interior of the building? Yes, Your Honor, Agent Coombs. Yeah, the agent's. Okay, Agent Coombs' testimony. What's clearly erroneous about the district court's finding that all those areas shown on there are adjoining? Because the key word is immediately adjoining, and the key to this rule is keep the officers safe. That's the whole reason for this. And they were outside. They were at the entryway, and they kept on moving forward and forward and forward and forward and upstairs. What they should have done, according to Lemus and Maryland v. Bowie, is to take a look and scan, make sure they were safe, shut the door, and leave. This marking was already outside. But even in Bowie, wasn't Mr. Bowie hiding downstairs in the basement of the house, and the Maryland state police officer stood at the top of the stairs and said, Come on out of there. Let me see your hands. And then they basically looked in all of the other adjoining rooms before they found the weapon that was used to convict him for being a felon in possession. In that case, what happened, Mr. Bowie came up the stairs, the officers opened up the door and yelled, and he walked up the stairs, came out, and another officer, Froelich, he decided to go down the stairs to take a look around to see if there was anyone else. While he was down there, he saw the red running suit, which was ultimately convicted him. And they found a gun, didn't they? I'm not recollecting that. I'm just remembering the red suit. Maybe I'm confusing the facts here, but I thought they also found a weapon in a closet. I'm not recalling that with the basement. Okay. I'm just not recalling it. But what's significant about that, and Justice Stevens, in his concurring opinion, said that the officer at the basement door should have looked to see if anyone was there, just like in our case, they should have looked in room A to see if there was anyone there, then shut the door to keep them safe. And the fact that he went down the stairs. Shut the door to keep them safe without first checking to make sure that somebody wasn't hiding downstairs who could ambush them? Well, Justice Stevens said to look to see if anyone was coming up the stairs. If no one was coming up the stairs and take a look, shut the door, but instead he went down the stairs, putting him in danger, and Justice Stevens said, this strategy is sensible if somebody wants to search the basement. And it's a surprising choice for an officer worried about their safety. Well, I guess to go back to Exhibit 3 on 168, looking at the diagram of the inside of the church from an officer safety standpoint, why is it unreasonable under the protective sweep doctrine to look very quickly in all those areas to make sure that there isn't somebody else who might attack them or otherwise interfere with effectuating the arrest? Your Honor, protective sweep is the second type of search. I'm on the search as an incident to arrest, which is the first. The Shymel search? Is that what we're talking about? No. I thought the district court upheld this on both grounds, both immediately adjacent and protective sweep. I don't think the district court reached the issue regarding protective sweep. I discussed it in my brief. I mean, isn't that what Maryland v. Bowie is all about? No. Maryland v. Bowie has two types of searches. The first search is if a person is arrested without reasonable cause or any kind of suspicion, the agents are allowed to search the immediately adjoining area to make sure that there's nobody hiding. Okay, but here the officers were armed with an arrest warrant. So a magistrate had determined that there was probable cause to arrest Ms. Marroquin. Yes. Okay. So we're effecting a lawful arrest. The place of the arrest is found by the district court to be in the area marked A on Exhibit 3. And I guess the question I'm asking is, from an officer safety standpoint, why doesn't the law permit the agents to do a sweep of the area shown on Exhibit 3 to make sure that somebody's not hiding in another part of the building who might attack them? Because it's, the law is immediate adjoining. You can't go into, on this type of search, search incident to arrest, you can't go down the hall, go down the ballroom, go up the stairs. Well, let me ask the question a different way. Under your view of the law, looking at Exhibit 3, what part of the diagram would the agents have been lawfully permitted to look into? Room A. Just room A? And if they could see room B, where they were seen, I mean, from where they were standing? Didn't room B have a pass-through counter so it was open in part to room A? So if somebody were crouching down on the floor or perhaps hiding inside the area that's marked C, or maybe in the two bathrooms, you're saying the agents wouldn't be permitted to look there in order to protect themselves? I think it's possible if you're in room A and you see room B and you see, well, maybe there's an issue there. I would go as far as that, yes. Okay. But how about the bathrooms? The bathrooms are no issue because they're right there. They're in A. So they can search the bathrooms? As long as, yeah. How about room C? No. No? Because you can't, that's going down the hallway, then it leads into the ballroom. It goes on and on and on. So you, if I'm understanding your answer, Counsel, you would draw a line somewhere starting between B and C on Exhibit 3 and running across to the edge of the bathroom wall. That's as far as they could go. And the reason why I do that, because the whole point of this is for officer safety. The further and deeper they get into the church or into the building, they are exposing themselves to more and more danger. Well, we have a picture, don't we? I mean, I'm looking at Government's Exhibit 5, Government's Exhibit 6, Government's Exhibit 7. I mean, this is a pretty open area. So if somebody did have an intention to attack the officers, it would be pretty easy for them to see from just about any part of this diagram, A, that there were officers there, B, that they were arresting Ms. Marroquin, and C, if he had evil intention to launch an attack from any of these areas. Isn't that what the district court found? That's what the district court found. Okay. But it's still locked in these exhibits. Your Honor, I believe it's on top of Room A. By looking at the staircase, the little cross marks, if you look on page 2168, there are some stairs, it looks like, that are going up next to the bathroom on the right-hand side. And then when you look at page 3, there are those stairs again. So they appear to be on top of A. I don't know that for sure. That's just my ---- Did they find anything incriminating in the loft? No, they didn't. But they did find incriminating information in Room B, did they not, and Room C? They did. And see, that leads me to the next point. This is supposed to be a very short search to make sure that they're safe. They spent five to eight minutes. That is a really long time, and it's amazing to see all the items that they saw. If you look at the search bar ---- Weren't there something like 50 trash bags that were just overflowing with identification and cards and medical records? I mean, how could you not miss it, even if you only had a fleeting glimpse? But you shouldn't be studying it. They knew that there were approximately 50 boxes that identified labels. They even read Post-it notes in the ---- Well, weren't there tables with, like, big pieces of paper that said duplicates for the different companies that were under investigation for durable medical equipment fraud? They saw that, and they saw Post-it notes, and they were able to ---- They viewed the trash, and was able to identify what was in the trash, that it was, you know, Medicare beneficiaries, maybe driver's license, all these details. If they're there to protect themselves, they shouldn't be ---- But as I understand the protective sweep doctrine, if items whose incriminating nature is readily apparent to fraud investigators is found in plain view, while the agents have a right to be looking where they are looking, then they may record those observations, report them, as was done here, to a magistrate judge, and obtain a search warrant for the premises. Yes, Your Honor, if you see, like, a gun or something that's real obvious, my point is, they stopped and took the time to take a close look at everything, and when it was all over, someone else who was in there overheard when the agents say, well, we're referring to the boxes, we found what we're looking for. They were looking for those items in there. Suppose we were to agree with you that the police officers exceeded the scope of their legitimate search, whether incident to arrest or protective sweep. Isn't it harmless error, given the other evidence that supported the probable cause for the search warrant to issue? No, Your Honor, we're talking about the independent source doctrine. Under that doctrine, you take the search warrant affidavit, and you take out everything that's tainted. Put that aside and look at what's untainted, and then you look at that and you see, was there a probable cause for a magistrate to issue the warrant? In this case, the government identified the untainted evidence as, the first one was, money paid from the companies into arms of grace. That's at 205. That does not tell an officer that there are, or doesn't tell anyone or a judge, that there are documents inside of a church. What about the evidence that they encountered Lionel Collette and Aluda Zabante in Room A, and those individuals told the agents they had been hired to shred documents at the church? Absolutely, Your Honor, but that was connected to the illegal search. But Room A, you said they could look in Room A. You always said that was within the permissible scope of the search. I'm sorry, Your Honor, I didn't hear. You said that they could, that Room A was within the scope of the permissible search. They talked to the two individuals after the search, after the illegal search. That's when they talked to the individuals, after it was all said and done, and they asked, well, what are you doing here, and all the files are out, and they're saying, well, we were hired to photocopy and to whatever. And that was connected with the illegal search, and that's why. That is tainted. That evidence is part of the illegal search. It's connected to it. That's why that can't be used as an independent source. But if they have a right to enter Room A, as I thought you conceded in response to my earlier questioning, they're lawfully present in Room A. Why can't they have a conversation with these two other individuals who were in Room A? I mean, for example, asking them, what are you doing here? And the answer is, well, I was hired to shred documents for these folks. Because by this time they had completed the search, the search of all the rooms and the upstairs. They had seen everything. They knew everything that was there that they could see, and they went back to them afterwards, and they spoke to them, what was in the church, after they did the illegal search. It's connected with the illegal search. And also in one of the. . . The business was carried on on the church premises. Just for a few months, Your Honor. Yes. Since a portion of the business was conducted on those premises, maybe since August. And this was October. That is true. But no one knew that. The agents didn't know that. And also, I just want to touch upon the Lemus case, which also is a controlling case. In that case, the reason why the agents were allowed to search all around is that Mr. Lemus was already arrested. He was inside his apartment, and he was handcuffed there. And so in that case, because it was a small apartment, the court allowed the search of all the rooms. And also in Thomas, which is a D.C. case that the district court relied upon, they entered the apartment, apprehended the defendant at gunpoint, and then they didn't arrest him until they were in the living room. And because it was a very tiny space, then it was okay to search around the other rooms for their safety. And a protective search is something different. A protective search is after the search is incident to arrest, if the agent has some knowledge, some specific knowledge, that there's dangerous individuals inside the building, then they can go take a look just to make sure. But Agent Kuntz didn't have any specialized knowledge. He just didn't believe Ms. Marquin when she said there's just the three of us. He says, I want to check it out myself.  Yes, Your Honor. Wasn't that the basis of the agent's concern, that they only had three people but there were four cars? Yes, but that idea was rejected in U.S. v. Reed, where the police went to the door and they saw there was an extra car in the parking lot. It was a Lexus. And that was one of the reasons why they thought there was an extra person in there, including the smell of marijuana. But this court rejected that. That that wasn't sufficient to think there was a dangerous person in there. But I guess the question was, why wouldn't that lead one to rationally conclude that there might be four people inside rather than the three who could be accounted for in room A? Because the rule is it has to be dangerous, violent individuals. That is the rule. It's just that somebody's in there. For a protective sweep? For a protective sweep, yes, Your Honor. How many district judges were on this case at different times? As far as I can tell, two. Judge King presided over the motion to suppress and Judge Hatter the trial. And I couldn't tell you why. I just don't know. Any further questions? Thank you. Thank you. Good morning, Your Honors, and may it please the Court. Ross Goldman for the United States. I'd like to begin this morning by addressing the Fourth Amendment issue. And in particular, the events leading up to the arrest of Ms. Marroquin and the subsequent search of the church. Agent Kuntz testified at the suppression hearing that he saw that Ms. Marroquin saw Agent Braun and another agent, Agent Prim, enter into the church, step in what was in his estimation approximately four to five feet, into room A, this foyer of the church, whereupon they encountered Ms. Marroquin. As the government's brief sets forth, at that point in time, a reasonable person in Ms. Marroquin's situation, knowing what she knew, would have not felt that she was free to leave. And therefore, the district court was correct in concluding that Ms. Marroquin was arrested at that point in time inside of the church. The subsequent protective search incident to the arrest of Ms. Marroquin was justified under Maryland v. Bowie and United States v. Lemus. From the officer's position standing inside room A, where they first encountered Ms. Marroquin and then subsequent to that, Mr. Colletti, they could see into this pass-through window into room B. Therefore, for that reason, room B was immediately adjoining the place of arrest. From their position looking into room B, down the hallway, they could see into room D. So Agent Kuntz was allowed under Bowie to do what he did, which is walk to the end of that hallway, just cross the threshold into room D so that he could ensure that there were no threats to the officers in room D. This was all permissible under Maryland v. Bowie because these spaces were immediately adjoining the place of arrest. And so at this point, Agent Kuntz, of course, makes the decision to withdraw from the premises and rather than seize what he saw in plain view, which he would have been entitled to do, but out of an abundance of caution, I think, withdrew from the premises and told the lead case agent, Special Agent Olivas, what he saw in the church. Agent Olivas then put that information, combined with a wealth of other information, into a search warrant affidavit. And then nothing else happened inside the church until the warrant was issued, at which point the officers conducted the search. On the issue of the government's alternative argument with respect to whether, even if the court were to conclude that the search was impermissible, would what's left have provided probable cause? I want to just speak to this, because an issue arose for the first time in Mr. Arouki's reply brief. I think it's important to note here that the execution of both the arrest warrant for Ms. Marroquin and the subsequent search warrant followed an extensive investigation of these defendants, their co-conspirators, and these four companies. And Agent Olivas' affidavit traced the money. And not only did it detail the scheme, but it traced what Agent Olivas' affidavit called significant sums of money to Mr. Arouki, Ms. Iqbal, and Mr. Arouki's church, Arms of Grace Church, in addition to other people and entities. And, of course, the affidavit recited that Ms. Marroquin, one of the co-conspirators, was arrested at the church. That itself provided probable cause for the warrant to issue. On top of that, you have the statements from Mr. Colletti and Ms. Zobanti that they had been hired by Mr. Arouki and supervised by Ms. Marroquin to do this. Are you arguing harmless error now? I am, Your Honor. This is the government's alternative argument. All right. So how far do you think that the police should have been able to wander around the church? And do you make any distinction about a difference between a church as opposed to being a home, as in Lemus? Well, I think in this, to answer your first question, Your Honor, I think in this case the officers were authorized to go everywhere they went downstairs, to be sure. Under which doctrine? Under Maryland v. Bowie. So Maryland v. Bowie has these two types of searches. One is what this court in Lemus termed a protective search incident to arrest. That entitles officers to go into areas that immediately adjoin the place of arrest without any suspicion whatsoever. In order to go to spaces beyond those that immediately adjoin, there needs to be some articulable suspicion that a dangerous person could be hiding there. The government is relying on this first doctrine, the suspicionless search of areas immediately adjoining. And so I think as the layout of the church, I think, makes clear, the rooms, what was referred to at the suppression hearing as rooms B, C, and D, immediately adjoined the place of arrest. So I think they could have gone everywhere they went in the downstairs. What about upstairs under that doctrine? The upstairs under that doctrine, it's hard to know because we don't know the layout of the church and we don't know exactly where the officers went upstairs, whether it was just in a loft or just in another room or in the loft and another room. Is there anything that they saw upstairs integrated into the affidavit for probable cause for the search warrant? There's one sentence in the affidavit that references having seen an unplugged computer that was turned off in the upstairs. That's it. And I think the district court was right to say, you know, it doesn't sort of matter whether the upstairs immediately adjoined because even if it didn't, then you would just excise that piece out from the affidavit and all of the evidence of probable cause would remain. Like I said, we don't know. If the loft were overlooking room A in the front door, then I think there's a very good argument, for example, that it would be immediately adjoining. If it overlooked the back of the church or somewhere else where there wasn't the immediate point of access or immediate ability to pose a threat to where the officers were, then I think it would be a more difficult argument. We just don't know. There was no testimony. There was a representation by the government that Agent Braun had done a sweep upstairs, but there was no testimony. We simply don't know any of the facts surrounding that. The point I wanted to make on the issue of the government's alternative harmless error argument, Mr. Iruki argues in his reply brief for the first time that the government shouldn't be allowed to rely on the statements from Mr. Colletti and Mrs. Abonte because they were in some sense a tainted fruit of the prior impermissible search. There are two points I want to make on that, at least. The first is there's actually no evidence in the record that says when the interview of these two people took place vis-a-vis the search of the inside of the church. We just don't know. And I think the reason we don't know, and this goes to my second point, is because the subject, these statements were never the subject of any of the defendants' motion to suppress. And this becomes very clear, and I would direct the Court to pages 124 and 125 of Mr. Iruki's excerpts of record, where the government told the district court of its intention to call the agent who took the statements to testify at the suppression hearing. And the district court asked why is that necessary. No one's challenging those statements. And then specifically asked Mr. Iruki's counsel, are you challenging what they had to say? Mr. Iruki's counsel said, no, Your Honor, we're not. And so the government then, the district court then said, well, I don't think you need to call this agent, Agent Webster. The government did not call Agent Webster. And, you know, I think under Federal Criminal Procedure 12, the argument is now waived. It's now too late to challenge as a tainted fruit something that was never challenged at any point in time in the district court. In this court, there's a United States v. Wright, a Ninth Circuit decision, 2000, which very clearly makes this point clear, that arguments, specific arguments in support of suppression not raised in the district court are waived. So the government would submit again, with or without these statements, there was ample untainted evidence establishing probable cause, but we do believe we can properly rely on these statements. Thank you. Thank you, Your Honor. I don't have anything else. Thank you very much. Your Honor, just real briefly, our response to the interview of the two individuals was in response to the government's raising the alternative argument in their brief. But why? I mean, you kind of have a double waiver issue here, do you not? It appears to me that if defense counsel at trial said we're not challenging those statements, then the government was not put on notice that it needed to call that witness in order to testify as to how they were taken. And then you raise the challenge here before us in the reply brief. Why shouldn't we invoke the appellate waiver rule and say you can't raise them in the reply brief because you're sandbagging the government again? I was just relying on the record, Your Honor, what was stated in the record that, from what I remember, it was after the search, that's when they started talking to these individuals. Yeah, but you're missing my point, counsel. If you waived it below and you waived it on appeal, why shouldn't we find it waived? If it walks like a duck and quacks like a duck. It was just, you know, it was in response to their argument. I think I still can rely on the state of the record. To raise a new argument that you didn't raise before either the district court or the court of appeal? I wasn't raising a new. Well, you're arguing that we shouldn't be allowed to consider those statements as independent facts to support probable cause if we exclude all the observations during the protective sweep. Isn't that your argument? No, my argument isn't. Maybe I'm wrong, but my argument is that they raised this independent source doctrine in their answering brief, and they raised the fact that the agent spoke with Mr. Collette, you know, during the search, which I believe was after the search. I see. Okay. And now it was just a response to their. Understood. Okay. Thank you. All right. This one housekeeping item. The record will show that. Egg pool was submitted. And this argument was limited to her cooey. All right. With that, we'll adjourn until 930 tomorrow morning.
judges: Pregerson, Wardlaw, Tallman